# In The Matter Of:

*Lincoln Lampley, et al. v*
*City of Jackson, Mississippi, et al.*

*Rakasha Adams*
*November 17, 2020*



Reporting
Realtime Court
Reporters

601-573-0961
amanda@awreporting.net

*Min-...l Index*

EXHIBIT

3

Rakasha Adams

Page 13

when I got in the shooting that we're here about today, seven o'clock in the morning.

Q. Okay. I'm going to show you -- this was the first notice that you were placed on administrative leave for the incident that we -- that you just discussed; do you remember receiving that --

A. I do.

Q. -- notice? Okay. And you were placed on administrative leave; correct?

A. Right.

MS. JACKSON-WINTERS: Mark this as Exhibit 2.

(Exhibit 2 marked for identification and attached hereto.)

A. And notice, now, I never had a grand jury when I was back at work at that -- you do know that; right? Because you know both of my grand juries came out together?

Q. (By Ms. Jackson-Winters) I'm going to ask the questions; okay?

A. Okay.

Q. That's how this works.

A. I was just making sure you knew that.

Q. Okay. Now, after that shooting, did you make a statement that, "I have emotional numbness, increased arousal, such as difficulty sleeping and concentrating,

Page 14

feeling jumpy and being easily irritated and angered"; do you remember making that statement?

A. Was that after that shooting or the other one?

Q. It was after the first shooting. Do you remember making that statement at any time?

A. No.

Q. I believe you already stated that following that, you were placed on administrative leave and then you saw a psychiatrist or a psychologist; is that correct?

A. I did.

Q. And how many times did you see them?

A. Twice.

Q. Do you recall when that first incident occurred?

A. The first incident of my shooting?

Q. Yes.

A. November 15, 2017.

Q. Okay.

A. At approximately 5 in the afternoon.

Q. Okay. And with that shooting, the November 15, 2017, you were placed on administrative leave with pay; is that correct?

A. Correct.

Q. And then an IAD investigation was conducted; correct?

A. Correct.

Page 15

Q. Okay. And then you saw the psychiatrist or a psychologist twice?

A. Dr. Burgess.

Q. Okay. And then you came back to work?

A. Correct.

Q. Do you know if your doctor cleared you to come back to work?

A. He did.

Q. Do you know if IAD cleared you to come back to work?

A. They did.

Q. Okay. Did you feel that you were ready to come back to work?

A. I did.

Q. Do you remember receiving this letter that brought you back to work?

A. Yes, ma'am.

Q. So you were off from November 15th to January 10th; correct?

A. (Nodded.)

Q. Okay.

MS. JACKSON-WINTERS: This will be marked as Exhibit 3.

(Exhibit 3 marked for identification and attached hereto.)

Page 16

Q. (By Ms. Jackson-Winters) For the January 27, 2018 incident, were you also placed on administrative leave with pay?

A. I was.

Q. And you understood why you were being placed on administrative leave with pay because -- due to the incident; is that correct?

A. Yes, ma'am.

Q. Is this the letter that put you on administrative leave with pay on -- for the January 27, 2018 incident?

A. Yes, ma'am.

Q. Which police chief put you an administrative leave with pay?

A. Anthony Moore.

MS. JACKSON-WINTERS: Mark this as Exhibit 4.

(Exhibit 4 marked for identification and attached hereto.)

Q. (By Ms. Jackson-Winters) I believe we already talked about this, but you were taken off of administrative leave with pay February 28, 2019; is that correct?

A. Yes, ma'am.

Q. And that is when you were put at the precinct -- well, at headquarters?

Rakasha Adams

Page 17

A. That's when I was reassigned to the jail.

Q. So when you first came off of administrative leave with pay, you were reassigned to the jail?

A. Right.

Q. Okay. Do you remember -- was that February 28, 2019 or was that before?

A. That was after my 90-day suspension.

Q. Okay. So after your 90 days --

A. Uh-huh.

Q. -- you were placed -- reassigned to the jail?

A. Right.

Q. Okay. At what point did you go to headquarters?

A. Well, you know headquarters is in the jail, but -- so --

Q. Right. But --

A. -- I was given a 90-day suspension after I signed -- after I filed a grievance.

Q. Okay.

A. So after I filed my grievance -- do you have a record of that?

Q. Remember, I ask the questions.

A. Oh, okay.

Q. Okay.

A. So -- well, if you don't, I have one for you. So after I filed my grievance, I was given a 90-day

Page 18

suspension.

Q. Okay.

A. So then after I came back to work, instead of going back to patrol, they gave me a reassignment to the jail.

Q. Okay.

A. And after going to the jail, I guess the civil service had told them to put -- all officers was going back to work. Instead of them putting me back to work, they put me at the front desk at headquarters.

Q. Okay. Is this the intended disciplinary action letter that you received?

A. It is.

Q. Okay.

A. And that was after the grievance.

MS. JACKSON-WINTERS: This will be marked as Exhibit 5.

(Exhibit 5 marked for identification and attached hereto.)

Q. (By Ms. Jackson-Winters) And this is the disciplinary action you received?

A. It is.

Q. Okay.

MS. JACKSON-WINTERS: This will be marked as Exhibit 6.

Page 19

(Exhibit 6 marked for identification and attached hereto.)

Q. (By Ms. Jackson-Winters) Now, your 90-day suspension, did you appeal that to the civil service?

A. I did.

Q. And do you know what the results of that was?

A. Oh, yeah.

Q. Let me go back, did you participate in the civil service hearing?

A. I did.

Q. Okay. And did the other officer that was involved in your situation, Corporal Taylor, did he also participate in the --

A. He did.

Q. -- civil service hearing?

A. He did.

Q. And he also received a 90-day suspension originally? Do you know?

A. Originally, he did.

Q. Okay. And then the civil service reduced his; correct?

A. Correct.

Q. Who else participated in that civil service hearing, if you remember?

A. Our attorneys did.

Page 20

Q. Okay. And is that it?

A. Yes.

Q. Okay. Do you remember when that was?

A. I'm not sure when the civil service meeting was.

Q. Okay.

A. But for the -- the action, you say -- my appeal, you wanted to know the results of it?

Q. No, I just asked about the 90 days and Taylor's getting reduced, that's all.

A. Oh, okay.

Q. After coming off of administrative leave with pay following the January 27, 2018 incident, I think we kind of talked about it, but tell me all the different areas that you were reassigned to. I know the jail and --

A. The --

Q. -- the front desk. Any others?

A. I been assigned to the jail. I been assigned to the front -- the front desk. I been assigned to the tele-serve division. I been moved from the tele-serve division to the auto theft division. I been moved from the auto theft division to the animal control division, which is the dog pound, and I been moved from the dog pound back to the tele-serve division.

Q. So you are currently in tele-serve?

A. Right.

Rakasha Adams

---

Page 25

A. No.

Q. No? Okay. Have you ever read any of the civil service rules?

A. No.

Q. Okay. So you would not be claiming that the City of Jackson violated any civil service rules; correct?

A. Yes.

MR. CORY: I would -- yeah, I would object to that to the extent she knows. Some of those questions are legal but --

A. Yes.

Q. (By Ms. Jackson-Winters) What civil service rules has the City of Jackson violated?

A. Plenty. For one, they violated a rule when they gave me a 90-day suspension.

Q. And you believe that the civil service -- that the City of Jackson violated the civil service rules by giving you a 90-day suspension?

A. Yes.

Q. Okay. Any other -- any other violation?

A. There's plenty out there. There's no consistency with the civil service. The civil service, they go by what the mayor says. I mean, he handpicks them, so, therefore -- I mean, if it's -- if you're for the mayor, if the mayor is for you, then, of course, he's

---

Page 26

going to do -- they're going to do what he says do. I mean, it's plenty of rules that they've violated.

Q. Okay.

A. But, I mean, I can't sit here and name each and every one of them offhand.

Q. Is it your -- is it your testimony that the civil service rules give you the right to work overtime?

A. No, but my thing is, when the City of Jackson recruits -- I was recruited in 2012 because they didn't have the funds to actually, you know, get the money for the academy, so that's how I ended up at MLEOTA. But the thing is, they put out there, you know, we don't have the funds, you know, to -- you know, their budget is lower than everybody else. You know, I could have went to Vicksburg. So, you know, coming into the City of Jackson, it was like you're going to make the majority of your money working overtime because the overtime is there.

So it wasn't like, you know, you're going to be able to -- you know, they tell you you can't -- you can't afford to make a living off of what we pay you, but working overtime, working part-time jobs in Jackson, is where you're going to get it. That's how you want to be able to make a living.

So that's how they recruit, you know, their employees. I mean, it would have been easier for me to go

---

Page 27

to Vicksburg or go to Clinton. But listening to, you know, the people that has been in Jackson for all of the years, it was like, okay, so if you're able to do it, then why not?

You know, when Herman Horton came to my door, you know, in Vicksburg and knocked on my door, you know, he was able to sit down on my couch and say, well, okay, I understand you're in Vicksburg, and I understand they make this amount of money, but, you know, if you're in Jackson, it's easy to make $75,000 with just overtime, you know, we have it there. And then, you know, you're going to get the experience that no other officer can ever make, so when you get ready to go back home to Atlanta, you can have that experience and you can make the money.

Q. Was Herman Horton the chief at the time?

A. No, he was the training staff -- he was the commander over the training academy.

Q. Do you know how much an hour you make as an officer with JPD?

A. Right now?

Q. Yes.

A. About $15.

Q. $15 an hour?

A. Something like that.

Q. And do you know what the minimum wage is?

---

Page 28

A. No.

Q. Okay. If I were to tell you that minimum wage is less than $15 an hour --

A. It -- it still wouldn't make me happy.

Q. But you wouldn't disagree with that?

A. Well, if I told you what the cost of living was, would you --

Q. So the way this works is that I ask you questions and you answer them.

A. You keep saying that.

Q. Yeah, I keep saying it. You keep forgetting.

A. I know.

Q. So if I were to tell you that minimum wage is less than $15 an hour, you wouldn't disagree with that; correct?

A. I probably would.

Q. Okay. So -- but when you signed up to be a Jackson Police Department officer, you knew how much you would be making; correct?

A. I -- when I signed up to be a City of Jackson police officer, I looked at what I was told.

Q. But not your contract?

A. I never seen a contract.

Q. Okay. Let's talk about that. So there's an employee handbook. Have you seen that?

---

Page 29

A. After I graduated.

Q. I'm sorry?

A. After I came out of the academy.

Q. Okay. So you saw --

A. So I never seen it before.

Q. Okay. So before you went into the academy, what did you see that told you how much you would be making as a Jackson Police Department officer?

A. To be honest with you, I never seen anything, me, personally. I never seen it -- I actually filled out a couple of applications. I filled out the application for Vicksburg. I filled out the application for Clinton. I filled out the application for Jackson. The day that I was supposed to go to the Clinton Police Department for the -- for the PT test, I was supposed to come to the City of Jackson as well. So I actually picked the City of Jackson to do the PT first.

Q. Okay. So when you got there, there was nothing that told you -- or even when you filled out the application, there was nothing that told -- wait, wait -- there's nothing that told you how much you would be making?

A. Like I said, it probably was, but I didn't look at it.

Q. Okay.

Page 30

A. Maybe you didn't hear that part.

Q. No, I didn't, but thank you for restating that.

A. You're welcome.

Q. Now, we were talking about the employee handbook, and you said you got that after the fact; correct?

A. Correct.

Q. Is there anywhere in the employee handbook that tells you that you will be making overtime?

A. There's something in the employee handbook that states something about overtime, but it doesn't say that you will be making overtime, but it's something in there that states overtime.

Q. Okay.

A. So it depends on how you want to word it.

Q. There's a section about overtime?

A. Correct.

Q. But it doesn't tell you that you are entitled to overtime?

A. Nothing -- you're not entitled to anything. You're not entitled to live tomorrow.

Q. But there was nothing that you read that told you that you would be getting overtime -- other than -- other than Herman Horton coming to your door while you were sitting on the couch telling you that, is there

Page 31

anything else that you read, that you signed, that said that you would be getting overtime?

A. Correct, so I guess it's -- it's basically like each and every day, the City of Jackson command staff can just lie in your face and just tell you that it's raining when it's actually peeing.

Q. Now, officers operate under what are called general orders; is that correct?

A. Correct.

Q. Are you familiar with those general orders?

A. Yes, ma'am.

Q. Okay. Is there anything in the general orders that talks about overtime?

A. That talks about it?

Q. Is there anything --

A. Of course.

Q. Okay. Is there anything in the general orders that tells you that, as an officer, you will get overtime?

A. No, ma'am.

Q. What about the right to provide off-duty law enforcement security services to private businesses; have you read anything about officers being guaranteed to do that?

A. No, ma'am. But the chief and them does that all the time, so I guess they're getting all the money from

Page 32

that.

Q. Okay. Now, regarding the January 27, 2018 incident, were you investigated by IAD? I think you said you were; correct?

A. Well, you know, that's part of the general orders, so, yes, ma'am.

Q. So that's a "yes"? Okay. Do you know if IAD found that you violated any general orders or rules and regulations of the Jackson Police Department?

A. They found that I violated the pursuit policy after I filed a grievance.

Q. Have you seen this from IAD, the findings and conclusions?

A. No, ma'am.

Q. Have you ever -- you've never seen that before?

A. Never.

Q. Okay. If you flip the page where it says policy pursuit, is that what you were referring to that -- the vehicle pursuit policy is one that they found that you violated?

(Pause.)

A. Well, I'm not going to go off of this, but they did say I violated a pursuit policy, but I have never seen that, so I'm not going to go off of that paper.

Q. Okay. Section 2, it says that -- performance of

Page 37

know, more stronger, and, you know, they say, well, you know, this male hit somebody in the head and had -- made them have blunt-force trauma and killed them, you know, so, of course, they don't need to go to the hospital. They don't need to see the psychiatrist. Just bring them back to work, you know. They're coldhearted killers, you know. Let's indict them, you know.

But over here, you have a female, you know, she pulled out a gun. She shot two people, you know. She killed them. Let's call her crazy, you know.

So I do think, you know, it's important for people to go to the doctor. But at the same time, I think, whether it's a male or a female, the department -- you know, since they're paramilitary and the police is supposed to be paramilitary, they should care about each and every one of their people. But, you know, when it comes to the City of Jackson, you know, when you're a female, oh, she's crazy; but when you're a male, oh, they will be all right, you know, let's send them back out there, you know. But when you're a female, you know, oh, she's psycho.

But to answer your question, I guess I do think it's important for the department to actually sit back and care about their people but not judge them because, you know, when you start judging people and you don't know

Page 38

what they're dealing with, when you've never been in the situation that they have been in or you never had to use your weapon in the line of duty just to get back home to your family and your loved ones, then you have no idea, so you have no right to judge.

But they should be concerned. And especially when that person is actually strong enough to open their mouth and reach out and say, "Hey, I'm having issues. I need you to do something." So, yes, they're supposed to care.

Q.  Do you recall the incident that caused you to write the letter?

A.  I do.

Q.  Okay.  What --

A.  There's a man that came -- he was standing outside of headquarters. He was actually -- didn't have on a shirt, didn't have on any underwear or anything. He was pulling on some car doors, very irate or whatever.

I had some male bailiffs in the thing, but they wasn't willing to help. He came in. He was irate, and I had to actually put him in some handcuffs or something, and I know it just triggered some -- some memories or something.

It was the first person that I actually had to arrest since coming back to work, so, I don't know, I

Page 39

think it was just some memories or whatever that I had to go through.

So I actually tried to get in contact with Assistant Chief Ricky Robinson for a couple of days. I was unable to get in contact with him. That was the only person that I could talk to at the time because the chief that we had, that we have right now, he's not a person that you can talk to.

So I was able to get in contact with Chief Robinson -- Assistant Chief Robinson and tell him that, since that incident happened, that I was having a little trouble sleeping and kind of feeling on edge, so he contacted IAD for me.

I talked to Commander Folsom. They actually took my duty weapon, sent me to see Dr. Moore at St. Dominics. I talked to Dr. Moore. He actually -- I actually seen him. He gave me a test, which is the test to see if I had PTSD or whatever. After speaking with him, I had another appointment -- well, actually, I only talked to him once. He had to see where my mind was or whatever to see if I was having any issues.

After that, he determined that I was perfectly fine because I told -- I had made Dr. Burgess a promise that if I had any other issues, that I would make sure I seek help or whatever if I was going through a backslide

Page 40

or whatever, so he said that he would write the letter back to JPD and tell them, you know, his findings or whatever.

He wrote the letter back to JPD. They didn't allow me to come back to work. I had to file another grievance to get back to work. So after August, I didn't come back to work until October 23rd.

So when he put me back to work on October 23rd, he actually cleared me. He just did -- he just said that he didn't want me on the streets, but he cleared me for all duties that I can work in any department except for patrol.

Q.  And that's the chief cleared you to work in all departments?  Who cleared you to --

A.  The doctor cleared me.

Q.  The doctor cleared you to work in any department, just not patrol?

A.  Yes.

Q.  Okay.

A.  So, therefore, I was -- I had -- I still had my full police powers so I wasn't on any modified duty or any of that.

Q.  In your letter, you spoke of being -- feeling very anxious and nervous?

A.  Right.

Rakasha Adams

Page 41

Q. Do you remember that?

A. Uh-huh.

Q. And you did talk about not being able to get a full night's sleep?

A. Uh-huh.

Q. And you felt that you were in danger for some reason?

A. Uh-huh.

Q. Okay. So based on that, your doctor said you could return, just not to patrol?

A. Yeah, he just didn't want me in patrol.

Q. And we talked about it. I think you said that, yes, it is important for the department to care about its people before they put them back to active duty?

A. Right.

Q. And the reason is because that could put the officer in danger and it could put --

A. Correct.

Q. -- the public in danger as well; correct?

A. Correct.

Q. So you are -- you have been given back your full police powers?

A. No.

Q. You have not been given back your full police powers?

Page 42

A. No.

Q. Okay. You have your duty weapon?

A. No.

Q. You do not have your duty weapon?

A. No.

Q. Okay. So after you came back from the second administrative leave -- after you wrote this and you went on administrative leave, after you came back, you weren't given back your gun and your badge?

A. I was.

Q. Okay. But it was taken away from you again?

A. Yes.

Q. When was it taken?

A. Maybe about two, three months ago. I went to work in animal control. I had an incident down at animal control. I had rats and stuff crawling all over my feet, hey, I had -- actually had to use the rest room on myself because, you know, it's an awful place in there. You don't have nowhere to use the rest room. I'm a female, you know. I ended up having to go use all my time up because I was on -- I had to go on FMLA. Let's see --

Q. This was two weeks ago?

A. No, about two, three months ago.

Q. Two or three months ago. So you are currently on FMLA? Do you need to take a break? We can take a

Page 43

break if you need to.

MR. CORY: Do you want to take a break?

MS. JACKSON-WINTERS: Let's take a break.

A. I'm good. So I had to -- so I got moved from the auto theft division to the dog pound.

Q. (By Ms. Jackson-Winters) Okay.

A. They didn't give me a reason why they moved me so -- they just moved me. So when I walked in the building, awful smell, rat feces, dead rats everywhere, walk over to the desk area, so -- I bought some supplies to clean it up.

So when I cleaned it up, then I was about to sweep the floor to get the stuff up off the floor, so the rats just start coming out and running over my feet, so I jumped on top of the table, and it was -- it was this guy that came in and the guy actually saw me after I was on the table and I had a panic attack. So the guy was on the table -- or I was on the table for about ten minutes, and then the guy actually picked me up and took me outside.

So I went outside, got myself together, and I left, and I went and I actually got my paperwork and I told them -- I tried to get them to actually -- before then, I asked them -- before they sent me to the animal control, can I just, you know, take a leave or something.

Q. Why did you want to take a leave before they

Page 44

sent you to animal control?

A. Because, I mean, that's not -- that's not a place for somebody to go. They didn't give me a reason for me to go there, so...

Q. There was no medical reason that you wanted to take a leave?

A. So I -- I got my paperwork and I went -- I ended up seeing the MEA doctor, talked to MEA Cares, and when I talked to him, he told me it was nothing that he could do for me, and he referred me to Psycamore.

Q. Dr. Psycamore?

A. No, he referred me to Psycamore up in Flowood.

Q. Is that a hospital?

A. No, it's a -- it's a therapy clinic or something. So I ended up having to pay out of pocket to go to Psycamore to their treatment services or whatever, so I did that, and then my FMLA -- FMLA ran out. I ended up having to -- you know, you have to get permission to get more days. James Davis denied it, so I had to come back to work.

So when I came back to work, I wasn't like physically ready to come back to work, so I was down in the office. At that time, I was still, you know, having, you know, my panic attacks or whatever. So I wrote my grievance or whatever and, you know, told them that I was

Rakasha Adams

Page 53

leave, when you were reassigned to the jail, you were getting a paycheck; correct?

A. Right.

Q. When you were reassigned to the front desk of headquarters, you were getting a paycheck?

A. Correct.

Q. When you were reassigned to tele-serve, you were getting a paycheck; correct?

A. I was.

Q. When you were reassigned to auto theft you were getting a paycheck; correct?

A. (Nodded.)

Q. You have to answer out.

A. Yes.

Q. When you were reassigned to animal control, you were getting a paycheck; correct?

A. Right.

Q. Now you are at headquarters at tele-serve and you are getting a paycheck; correct?

A. Correct.

MS. JACKSON-WINTERS: That's all I have for right now. Thank you very much.

EXAMINATION BY MR. CORY:

Q. Couple of questions for you real quick. Right now -- I just want to make sure I understand. Right now,

Page 54

what's the reason you're not working on the streets? Is that by your choice or is that a doctor's choice where you're in agreement or is that something -- you want to be on the streets but you're -- the department won't let you?

A. I want to be on the streets. When I went to the doctor, I guess -- I'm not sure if that's his decision or however, but I want to be out there.

Q. What are -- what have you been told -- what's the last thing you have been told as far as your duty status?

A. I haven't been told anything. As far as the administration staff, they keep telling me that I'm on a modified duty. I have been denied a right to a City vehicle. I have been denied the right to everything that every officer has been given because they keep telling me that I am on modified duty.

Q. When you -- what are the things that you can't do that other officers can do?

A. I have not been going to classes. I have not been going to trainings. I haven't been doing anything because they keep telling me that I'm on modified duty.

Q. What about overtime?

A. I don't get any overtime.

Q. Are you eligible for overtime or they just don't give it to you or do you know?

Page 55

A. I don't know.

Q. Is there -- is there -- are there -- have they outlined anything you can do to return to your regular duty as a patrol officer?

A. No.

Q. Are you able to work -- are you working another job, too, to supplement your income?

A. No.

Q. Do you know if -- what's the reason you're not doing that right now?

A. Because I just -- I'm just now being put back on -- I mean, the hours that I work are from 8 to 4, and they just now put me back on 8 to 4. They had me working civilian hours, which are 8 to 5. Never has a police officer been working the same hours that a civilian works, which is 8 to 5.

Q. Is the only time you did not get paid anything, that was during your 90-day suspension?

A. Right.

Q. Now -- but you're at headquarters right now?

A. Yes.

Q. Do you have personal knowledge of command staff level officers getting overtime?

A. I mean, they get like a special pay.

Q. For what? What do you know about that?

Page 56

A. I mean, they work details. They work like at the bars and places like that, at nightclubs, and, you know, other places.

Q. Why do they do that?

A. I mean, because they can't survive on what they're making either.

Q. Are you scheduled to go back to a doctor?

A. No.

Q. Are you getting any treatment right now for anything?

A. No, and if I was getting treatment, it all comes out of pocket.

Q. When -- you talked about the dog pound. When an officer is sent to the dog pound --

A. It's a form of punishment.

Q. Is there a full-duty police officer assigned to that -- to the pound?

A. No, the people that works in the dog pound, they're just hired. They don't get any certain type of training. They don't do anything. So usually when an officer is sent there, it's a form of punishment.

Q. And when you have been -- when you were reassigned to the dog pound, how were you reassigned? Did you get a letter?

A. I never received a letter. I was given a

Rakasha Adams

Page 61

CERTIFICATE OF COURT REPORTER

I, Kelly D. Brentz, Court Reporter and Notary Public in and for the County of Madison, State of Mississippi, do hereby certify that the foregoing 59 pages, and including this page, contain a true and accurate transcription of the testimony of Rakasha Adams, taken by me in the aforementioned matter at the time and place heretofore stated, by stenotype and later reduced to typewritten form under my supervision by means of computer-aided transcription.

I further certify that under the authority vested in me by the State of Mississippi that the witness was placed under oath by me to truthfully answer all questions in this matter.

I further certify that I am not in the employ of or related to any counsel or party in this matter and have no interest, monetary or otherwise, in the final outcome of this proceeding.

Witness my signature and seal this the 7th day of December 2020.

_____

KELLY D. BRENTZ, CSR #1518

My Commission Expires:  February 1, 2023